Daniel Lon **GRAHAM**, Appellant,

v.

James **MABRY**, Commissioner, Appellee.

No. 80–1875.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1981.

Decided April 3, 1981.

---

Melva Harmon, Little Rock, Ark., for appellant.

Steve Clark, Atty. Gen., by Jack W. Dickerson, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before LAY, Chief Judge, and STEPHENSON and ARNOLD, Circuit Judges.

**ARNOLD, Circuit Judge.**

Daniel Lon Graham was convicted of first-degree murder in 1971 in the Circuit Court of Washington County, Arkansas. The conviction was affirmed on direct appeal, but the Supreme Court of Arkansas reduced the sentence from death by electrocution to life imprisonment. *Graham v. State*, 253 Ark. 462, 486 S.W.2d 678 (1972). A petition for post-conviction relief under what was then Rule One of the Arkansas Supreme Court's Rules of Criminal Procedure (now Ark.R.Crim.P. 37) was unsuccessful. Graham then brought a petition for habeas corpus in the United States District Court for the Eastern District of Arkansas.[1] The district court appointed counsel and held an evidentiary hearing. After three full but unpublished opinions dealing with various aspects of the case, the petition was dismissed with prejudice, and this appeal followed. Graham argues that he is being held in violation of the federal Constitution for two reasons: (1) Bob Squires, a man with whom Graham had had a business quarrel, was seated on the trial jury; and (2) pretrial publicity was so massive that the jury which found Graham guilty was not impartial. We affirm, for reasons that will be separately set out with respect to each of these contentions.

**I. The Seating of Juror Bob Squires**

At the request of defense counsel, each potential juror was separately examined by court and counsel in chambers. When Bob Squires was called for voir dire examination, ten jurors had been seated. He testified that he lived at Springdale, Arkansas, where the crime took place, and that he had known Graham. Squires was an employee of George's Feed and Supply, in charge of placing chickens with growers. Graham was a grower whose chickens came from George's. Squires gave the following evidence with respect to his association with Graham:

---

1. The Hon. Elsijane Trimble Roy, United States District Judge for the Eastern and Western Districts of Arkansas.

Q. [By the Court] Well, from that association did you develop any prejudice towards him in this case?

A. No, I haven't.

Q. Could you be fair to him, to his cause?

A. I think I would.

   \*    \*    \*    \*    \*    \*

Q. [By defense counsel] Now, Mr. Squires, you never had any difficulty with Mr. Graham during the time you knew him, did you?

A. No, sir.

Q. You don't have any prejudices or anything at all back there from your association with him that would carry over into this courtroom?

A. None at all.

Counsel did not challenge Squires for cause. Nor did he use a peremptory challenge, although at the time he had one left. Squires was pronounced acceptable by both sides and became a member of the trial jury.

At the evidentiary hearing in the district court, Graham was the only witness who testified on this issue. Neither Squires, nor the public defender who conducted the voir dire of Squires, nor either of Graham's other two court-appointed trial attorneys, was called as a witness. Graham said he had been a chicken farmer, dealing with Squires at George's Feed & Supply Co., in the fall of 1968. According to Graham, his chicken house burned, and he notified Squires that for this reason he could not accept a delivery of chickens scheduled for the next day. He testified that he and Squires "cussed" each other, both over the telephone and at Squires's office, and that Squires told him he was tired of people breaking their contracts and said Graham would never get any more chickens. Graham said that during the jury selection he told his lawyer that he and Squires had had "some bad

misunderstanding," and that counsel had told him, " 'We have used all of our twelve challenges to excuse a juror, or whatever, and we'll just have to see if we can excuse him on cause.' Or something like that."

■ The district court held that the objection to an alleged bias on the part of Squires was not open on federal habeas corpus because it had not been made in the state trial court, as required by Arkansas's contemporaneous-objection statute, Ark. Stat.Ann. § 43–1914.[2] We agree. The leading case is *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), in which the Supreme Court held that the failure of trial counsel in a state court to object to the admissibility of a confession on *Miranda* grounds, barred the defendant from raising that issue in federal habeas corpus, absent a showing of cause for the noncompliance with the state's contemporaneous-objection rule, and a showing of actual prejudice resulting from the alleged constitutional violation. The "cause" and "prejudice" formulation of *Wainwright* was drawn from the decision one Term earlier in *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), holding that a district court erred by considering on habeas corpus a contention that black people had been systematically excluded from a state grand jury, when defense counsel had not timely made that argument under the law of the state. In a collateral attack on a conviction, the Court held, petitioner must make "not only a showing of 'cause' for the defendant's failure to challenge the composition of the grand jury before trial, but also a showing of actual prejudice." *Id.* at 542, 96 S.Ct. at 1711 (footnote omitted).

The opinion of the Court in *Wainwright* forcefully explains the reasons for honoring a contemporaneous-objection rule:

> The failure of the federal habeas courts generally to require compliance with a

2. "It [a challenge] must be taken before he [the juror] is sworn in chief, but the court, for good cause, may permit it to be made at any time before the jury is completed." Here, the challenge was not made at any time in the trial court, nor on direct appeal to the Supreme

Court of Arkansas, nor in Graham's Rule One petition, nor in his original *pro se* petition for federal habeas corpus. It was raised for the first time in the amended habeas petition filed by counsel appointed for Graham by the district court.

contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event. A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the courtroom, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification.

433 U.S. at 90, 97 S.Ct. at 2508.

A court faced with the contention that some state procedural default bars federal habeas corpus relief must first decide whether the question is to be decided according to the "cause" and "prejudice" requirement of *Wainwright v. Sykes, supra,* or according to the older rule of *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), under which federal habeas will lie unless the petitioner's noncompliance with state rules of procedure was a deliberate bypass of the state courts. The opinion of the Court in *Wainwright v. Sykes* itself does not answer this question. *Fay* was not overruled, however, so the lower courts are safe in assuming, it seems, that part of *Fay* survives *Wainwright.* In *Rinehart v. Brewer,* 561 F.2d 126 (8th Cir. 1977), this Court indicated that *Fay* still applies where the alleged waiver of an objection was the result of a defendant's own decision. "However," we went on to say, "where the waiver relates to events during trial such as waived objections or counsel's tactical decisions the 'cause and prejudice' standard applies." *Id.* at 130 n.6.

This distinction between decisions made by the client himself and decisions made by counsel on his behalf was adumbrated in the concurring opinion of Mr. Chief Justice Burger in *Wainwright v. Sykes,* 433 U.S. at 91–94, 97 S.Ct. at 2508–2510. Not only *Rinehart,* discussed above, but also later cases decided by this Court indicate that we have adopted the distinction. In *Collins v. Auger,* 577 F.2d 1107, 1109 (8th Cir. 1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979), the "cause" and "prejudice" requirements were said to apply to "trial errors," for example, objections to the introduction of evidence, including a confession or admission of the defendant. In *Parton v. Wyrick,* 614 F.2d 154 (8th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 131, 66 L.Ed.2d 56 (1980), the *Wainwright* rule was held to bar consideration on federal habeas of a contention that prior convictions had been improperly used against petitioner, where no objection had been made to that use at trial in the state courts. And in *Dietz v. Solem,* 640 F.2d 126 (8th Cir. 1981), the cause-and-prejudice test of *Wainwright v. Sykes* was applied to failure to object to an improper jury instruction.

█ In the light of these authorities, we hold that *Wainwright v. Sykes,* rather than *Fay v. Noia,* is the controlling authority in the instant case. Some decisions with respect to the conduct of a criminal case are customarily made by the client himself—whether to plead guilty, whether to waive trial by jury, whether to appeal, and the like. Other decisions, which may as a practical matter be equally important, are typically made by counsel—whether to object to the introduction of certain evidence, whether to object to jury instructions, and so forth. The question of how to conduct voir dire of potential jurors, and whether to challenge a juror, either for cause or peremptorily, is well within the usual function of trial counsel. An attorney will, to be sure, consult with his client about the members of a jury panel, in order to determine if the client knows any of them, or has any reason to believe that one or the other of

the jurors might be favorable or unfavorable to his case. Once having obtained this basic information, however, it is typically up to the lawyer to decide what to do with it, to frame the questions he will put at the voir dire, and to decide what requests to make of the trial court after these questions have been answered. Just so, in the present case counsel consulted with Graham about his knowledge of members of the jury panel. It then became the duty of counsel to act upon this knowledge, a duty necessitating a knowledge of the law and also of appropriate trial tactics. The decision whether to challenge a juror for cause depends upon many variables: the nature of the defendant's prior acquaintance with the juror, if any; the number of peremptory challenges already used; the likelihood of the court's upholding the challenge for cause; and an assessment of who might become a juror in place of the challenged person, if the challenge is upheld, to name some of the factors that might be relevant. This kind of decision, we hold, must be assessed by a federal habeas court under the standards of *Wainwright v. Sykes.*

■ The question occurs, therefore, whether Graham has shown adequate cause for the failure to challenge Bob Squires, and, if so, whether this failure produced actual prejudice to Graham. Graham testified that he told one of his lawyers that he had had a quarrel with Squires during the time when he grew chickens for George's Feed & Supply Company. According to Graham, the lawyer responded that he could not challenge Squires peremptorily because all of his peremptory challenges had been used, but that he would try to challenge him for cause. This testimony fails to establish "cause" for *Wainwright* purposes. For one thing, the testimony is directly contrary to the record, which shows that Graham in fact had one peremptory challenge left when the examination of Bob Squires on voir dire began. If counsel had felt that the information imparted to him about Graham's previous association with Squires was sufficiently serious, he could have used a peremptory challenge and prevented Squires from becoming a member of the jury.

Since Graham's trial counsel did not testify at the evidentiary hearing below, we do not know what his reasoning was in failing to challenge Squires for cause, but the portion of the transcript quoted above furnishes a good basis for making a reasonable inference as to what happened. Counsel did in fact question Squires as to his previous association with Graham, and Squires testified under oath that he had had no difficulty with Graham, and that nothing pertaining to his previous business association would prevent him from hearing the case fairly. Possibly counsel asked Squires these questions precisely because Graham had told him of his previous altercation with Squires. When Squires denied on the record that any such altercation had taken place, and added that he could try the present case solely on the law and the evidence without regard to anything that had happened in the past, any basis for a challenge for cause disappeared, and the chance that such a challenge would have been sustained became small indeed. As for the failure to use a peremptory challenge to strike Squires from the jury, it is sufficient to note that Graham's twelfth and last peremptory challenge was exercised with respect to the very next person called for voir dire examination. Counsel knew the order in which the jurors were to be called for examination, and it is entirely reasonable to assume that counsel simply had stronger reasons for excluding the next person, than he did for excluding Squires. Considerations of this kind become more and more compelling as the number of peremptory challenges left becomes less.

In these circumstances, we hold that Graham has failed to establish sufficient cause for the failure to object to Squires's taking a seat on the jury. If counsel had been unaware of the supposed previous connection with Squires, *cf. Rinehart v. Brewer*, 561 F.2d 126 (8th Cir. 1977), or if the failure to challenge Squires for cause were such a grievous default as to draw in question the effectiveness of Graham's trial counsel, a different situation might be presented. In

the instant case, we are convinced that neither of these circumstances existed. Under Graham's own theory on this appeal, his lawyer was fully aware of the facts about his previous association with Squires. The record shows that the lawyer questioned Squires on voir dire about this association. Our review of the entire transcript of the voir dire, in addition, shows that counsel thoroughly, even exhaustively, interrogated each potential juror, including Squires, on every conceivable aspect of the case relating to the jurors' ability to judge it fairly. Having conducted such a thorough voir dire, and having, in the case of Squires, failed to develop through this interrogation any substantial reason to doubt the juror's impartiality, counsel should not be found at fault for failing to make a challenge for cause that would almost surely have been overruled, and properly so.

Conceivably counsel could have asked the trial court to excuse Squires from the room, and hear testimony by Graham himself about the nature of his and Squires's previous business dealings. The court could then have been asked to determine, by resolving the conflict in testimony that might have occurred, whether Squires could still be considered impartial. Whether the trial court would have permitted such a procedure, we do not know. We decline to hold that the failure of Graham's counsel at trial to pursue this tenuous avenue rendered his defense of Graham in any sense ineffective.[3]

This result is reinforced by the pre-*Wainwright* decision in *Francis v. Henderson, supra.* There, as stated above, federal habeas relief was held unavailable because of petitioner's failure to raise in the state courts the question of systematic exclusion of black people from the grand jury that indicted him. Of course there are distinctions between the functions of grand and petit juries, and the Constitution of the United States, as presently interpreted by the Supreme Court, does not even require that states use grand juries. The considerations justifying a contemporaneous-objection rule, however, are virtually the same with respect to questions of the impartiality of a petit jury, as they are with respect to questions of the composition of a grand jury. In both cases, a decent regard for the state-court system, which is, after all, just as much obligated by oath to obey the Constitution of the United States as we are, indicates that objections, where reasonably possible, should be tendered to the state courts, at least in the first instance. To consider on federal habeas corpus an objection that could have been raised before the state court, when no clear or logically consistent reason for failing to raise it is tendered, is to make serious inroads on the integrity and jurisdiction of the state-court systems, which are responsible for the administration of criminal justice in a much more pervasive sense than the federal courts. In short, a challenge to a petit juror for cause is just the kind of question that should be tried and finally determined, absent special circumstances, in the court having general jurisdiction of the type of criminal prosecution involved. The district court correctly held that the failure to raise this issue before the state courts made it inappropriate for resolution on federal habeas corpus.

## II. Pretrial Publicity

The murder for which Graham was tried, and the robbery out of which it arose, took place on June 17, 1971. Beginning with the next day, a considerable amount of publicity, primarily in newspapers and on the radio, was generated. Within a few days the fact that Graham was a suspect became known, and his name was prominently displayed in headlines in the Washington County, Arkansas, area on a number of occasions. Graham had escaped from the Arkansas State Penitentiary about two and a half weeks before the crime, and this fact

3. Since Graham has failed to satisfy the "cause" requirement of *Wainwright v. Sykes*, it is unnecessary to explore whether the presence of Squires on the jury worked any "actual prejudice" against him. Both "cause" and "prejudice" must be established under *Wainwright v. Sykes*. The failure of a habeas petitioner to establish either of these requirements bars federal habeas relief.

was reported in news stories. On one occasion a front-page picture showed Graham in his prison uniform. Fairly constant publicity continued through July and the early part of August, until Graham, having been captured in Michigan, was extradited to Arkansas. He was arraigned on August 6, 1971, and from that day until just before the trial there was an almost complete lull in press attention. Between August 6 and October 29, 1971, the day on which the evidentiary hearing was held on Graham's motion for continuance based on prejudicial pre-trial publicity, only one radio story was aired, and no newspaper stories were run. An article about the case did appear in a detective magazine, but the evidence as to how many copies of this magazine had actually been sold to readers in Washington County was inconclusive.

As previously indicated, the trial court allowed counsel to question each potential juror separately in chambers. The voir dire examination takes up 748 pages of transcript, a figure that compares with 460 pages of actual trial testimony.[4] The trial court was generous in permitting lengthy interrogation of potential jurors. In all, 93 people were examined before the 12 jurors and one alternate who ultimately served were selected. Thirteen jurors were excused as a result of preliminary questioning by the Court before the in-chambers individual interrogation began. Of the remaining 80 persons examined, 20 were excused for cause for reasons related in some way to pretrial publicity.[5]

The Supreme Court laid down the standard to be applied in this kind of case in *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961):

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

■ The Court has also warned, however, that a juror's disclaimer of any present bias, or undertaking not to be affected by any opinion formed in the past, is not controlling and is not to be blindly accepted without regard to the other circumstances of the case. *E. g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Publicity can be so pervasive and unfair as to make incredible the protestations of jurors that they will not be influenced by it. Furthermore, reviewing courts may not simply rely upon the determination of the trial judge that jurors have given satisfactory assurances of impartiality. It is our duty to evaluate independently the examination of prospective jurors in order to satisfy ourselves that the trial jury in fact possessed impartiality, which is an indispensable attribute of justice.

---

4. This comparison makes one wonder whether the tail was wagging the dog.

5. The District Court's opinion states that 22 out of 92 jurors, or 23.9%, were excused for reasons which were related to pretrial publicity. Appellant's brief argues that 84 jurors were examined individually by the Court, and that 30 of these were excused for cause, either in connection with pretrial publicity or because of some other kind of prior knowledge of the crime. As indicated in text, our own count is that 20 out of 80 jurors examined individually were excused for causes related in some way to pretrial publicity. We do not stop to inquire in detail into the reasons for these numerical discrepancies. The transcript of the voir dire examination is not always unmistakably clear. In any event, the numerical differences are not so significant as to rise to a constitutional level.

*Irvin v. Dowd, supra,* is a good example of a case in which publicity was so prejudicial as to require that a conviction be set aside. While generalizations are not always helpful in this area, and each case must stand or fall on its own facts, it is instructive to note briefly some of the dispositive factors that the Supreme Court considered in *Irvin.* There, one change of venue, to an adjoining county, had already been granted on account of extensive pre-trial publicity. A second change of venue was requested, but the trial court denied it, apparently because it construed a state statute to limit a defendant to one change of venue only. The voir dire examination of prospective jurors lasted four weeks (as compared to two days in the instant case). There was a continuous barrage of publicity during the six or seven months prior to trial. Newspapers carried the fact that the defendant had confessed to six murders, including the one for which he was on trial, and 24 burglaries. They also reported his offer to plead guilty in return for a 99-year sentence, an offer that was refused by the state, which was holding out for the death penalty. Of the 430 jurors examined during the four-week voir dire, 268, well over half, were excused for cause because they had fixed opinions on the guilt of the defendant. Eight of the twelve persons who actually served as the trial jury thought defendant was guilty, and one of them said that he could not give the defendant the benefit of the doubt. In this situation, although each of the jurors stated that he could be impartial despite his opinion, the Supreme Court held that the conviction had to be set aside.

*Sheppard v. Maxwell, supra,* is another example of the kind of situation in which the Supreme Court felt it necessary to set aside a conviction. There, newspaper coverage included numerous editorials, some of them on the front page. The editorials, among other things, accused public officials of a lack of zeal in prosecuting the defendant, and demanded immediate and more vigorous action against him. News stories criticized defendant's alleged lack of cooperation with the investigation, although in fact he had submitted himself to frequent and extensive questioning without the presence of his attorney. The papers also reported that the defendant had refused to take a lie-detector test and had declined to be injected with a "truth serum." One editorial even said that defendant had been proved under oath to be a liar. Finally, the defendant, who was charged with murdering his wife, was accused in the news columns (falsely) of a number of adulterous love affairs. In this situation, the Supreme Court was unwilling to be bound by the jurors' disclaimers that they would not be influenced by the publicity to which they had been exposed. It is important to note, in addition, that the trial court cut short defense counsel's questioning of jurors as to whether they had heard or read specific prejudicial comment in the press about the case.

Other Supreme Court opinions, in which the convictions were not set aside, involved fact situations closer to the one now before us. In *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), there was extensive pretrial publicity, both in the area where the trial was to be conducted, and in the national press, but the publicity consisted of "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." *Id.* at 556, 82 S.Ct. at 963. Most of the jurors selected had been exposed to some publicity, but the defendant did not challenge any of them for cause, and the publicity was not so great, the Supreme Court held, that a court could not believe the answers of the jurors to the effect that they would not be irreparably prejudiced by it. And in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Court emphasized that "[q]ualified jurors need not ... be totally ignorant of the facts and issues involved." *Id.* at 799–800, 95 S.Ct. at 2035–2036. Although each juror had some knowledge of defendant's past crimes, "[t]he *voir dire* in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Id.* at 800, 95 S.Ct. at 2036. Cases like *Irvin* and *Shep-*

*pard* were distinguished as involving "a trial atmosphere that had been utterly corrupted by press coverage." *Id.* at 798, 95 S.Ct. at 2035.[6]

This line of cases in the Supreme Court demarcates fairly clearly the line between what is permissible and what is not, and the subject is further illuminated by a number of cases decided in this Circuit. In *United States v. McNally*, 485 F.2d 398 (8th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974), a federal conviction was affirmed on direct appeal. There had been front-page coverage of the alleged crime before trial, but the reporting was accurate, objective, and unemotional. "Public passion and sensationalism through the media or otherwise is devoutly to be avoided," *id.* at 402, but "[j]ust because . . . there has been widespread or even adverse publicity is not in itself grounds to grant a change of venue." *Id.* at 403 (footnote omitted). *Mastrian v. McManus*, 554 F.2d 813 (8th Cir.), *cert. denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977), is also relevant. There, all 12 of the jurors chosen to try the case had read something about it, and 42% of the prospective jurors examined on voir dire had an opinion as to the guilt of the defendant. Each of the jurors chosen claimed to have no present opinion as to guilt, however, and habeas corpus was denied. "With our present methods of communication, it is unlikely 'any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.'" *Id.* at 818, quoting *Irvin v. Dowd, supra*, 366 U.S. at 722–23, 81 S.Ct. at 1642. Compare *Rollins v. Wyrick*, 574 F.2d 420 (8th Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978).

The extent and effect of pretrial publicity in this case are fairly arguable, and court-appointed counsel for Graham has done a commendable job of urging the strongest points of her case. We are nevertheless convinced, on balance, that the facts of this case would not sustain a holding that Graham has borne his burden of showing that he was not tried by an impartial jury. Although each of the jurors selected to sit apparently had had some exposure to publicity concerning the case, that publicity was not inflammatory or disproportionate. The reporting was factual and objective, and it is not claimed that any false information about Graham got into the papers or on the radio. Trial counsel for Graham did not move for a change of venue, a circumstance considered relevant by the Supreme Court in *Stroble v. California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952).[7] Each of the jurors sworn to try the case testified on voir dire either that his exposure to pretrial publicity had been insignificant, or that the publicity could be completely disregarded, or both. These answers were neither perfunctory nor casual. They were the result of intensive questioning, conducted both by the trial court and by counsel for both sides. None of the persons selected to sit on the jury was challenged for cause. Graham complains that four of his challenges for cause were overruled, but in each of these cases counsel used a peremptory challenge, so none of the persons against whom these challenges were directed actually became a

---

6. The Supreme Court in *Murphy* also considered the effect of *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam), a case which Graham cites to us on the instant appeal. In *Marshall*, a conviction in a federal district court was reversed on direct appeal because some of the trial jury had been exposed, during the trial, to newspaper articles about the defendant's prior convictions. The case was reversed notwithstanding the fact that the jurors involved, under questioning by the trial judge, insisted that they had given no weight to the publicity that had come to their attention. The *Murphy* Court distinguished *Marshall*, explaining that it was based, not on the Constitution, but on the supervisory power of the Supreme Court under the lower federal courts. "We cannot agree that *Marshall* has any application beyond the federal courts." 421 U.S. at 798, 95 S.Ct. at 2035. In the present case, of course, we are concerned only with the Due Process Clause of the Fourteenth Amendment. We have no supervisory power over the state courts.

7. "[W]e think it significant that two deputy public defenders who were vigorous in petitioner's defense throughout the trial, saw no occasion to seek a transfer of the action to another county." 343 U.S. at 194, 72 S.Ct. at 605.

member of the jury. And finally, there was virtually no publicity for almost two months before the hearing on Graham's motion for a continuance.

Graham was entitled to a fair trial before an impartial jury. We conclude that he received it.

The judgment is affirmed.