871 F.2d 1384
 Eugene Wallace PERRY, Appellant,
v.
A.L. LOCKHART, Director, Arkansas Department of Corrections,
Appellee.
Eugene Wallace PERRY, Appellee,
v.
A.L. LOCKHART, Director, Arkansas Department of Corrections,
Appellant.
 Nos. 86-2262, 86-2287.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 18, 1988.
Decided April 10, 1989.
Rehearing and Rehearing En Banc Denied June 16, 1989.
 
 Jeff Rosenzweig, Little Rock, Ark., for appellant Singleton.
 Jo Ann Goldman, Little Rock, Ark., for appellant Perry.
 Clint Miller, Asst. Atty. Gen., Little Rock, Ark., for appellee.
 Before JOHN R. GIBSON, FAGG and WOLLMAN, Circuit Judges.
 WOLLMAN, Circuit Judge.
 
 
 1
 Eugene Wallace Perry appeals the district court's denial in part of the habeas corpus relief Perry requested. The State cross-appeals the order setting aside Perry's sentence of death. We affirm in part, reverse in part, and remand for reinstatement of the death sentence.
 
 
 2
 On the evening of September 10, 1980, the bodies of Kenneth Staton and his daughter, Suzanne Ware, were found bound and gagged in the back of the Staton Jewelry Store in Van Buren, Arkansas, where they both had worked. Each had been killed by two gunshots to the head fired at close range. An estimated $100,000 worth of jewelry and watches was missing from the store.
 
 
 3
 In 1981, Perry was convicted of capital felony murder for these killings and was sentenced to death. The Arkansas Supreme Court affirmed the conviction and sentence, see Perry v. State, 277 Ark. 357, 642 S.W.2d 865, 868 (1982), and denied Perry's request for post-conviction relief under Ark.R.Crim.P. 37.[1] Perry v. State, 279 Ark. 213, 650 S.W.2d 240, 243 (1983).
 
 
 4
 On July 27, 1983, Perry filed a petition for a writ of habeas corpus under 28 U.S.C. Sec. 2254, alleging numerous procedural errors during his Arkansas State court trial. On May 14, 1986, Perry filed a special supplement to his petition, challenging the validity of the death sentence under Collins v. Lockhart, 754 F.2d 258 (8th Cir.), cert. denied, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). The district court found no error undermining Perry's conviction, but held that the death sentence was invalid under Collins and ordered that the State either resentence Perry or reduce his sentence to life without parole. 656 F.Supp. 46 (E.D.Ark.1986).
 
 
 5
 On appeal, Perry raises the following contentions: (1) that he was deprived of his constitutional rights under the compulsory process clause of the sixth amendment, (2) that the state trial court improperly denied a second change of venue despite prejudicial publicity, (3) that pretrial identification procedures were tainted, and (4) that crime scene photos were admitted erroneously. The State cross-appeals the district court's order, arguing that the court misapplied Collins.
 
 
 6
 The case was submitted November 13, 1987. On January 13, 1988, the United States Supreme Court decided Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). We requested additional briefing and argument on the Collins issue in the light of Lowenfield, and the case was resubmitted following reargument on August 18, 1988.
 
 I.
 
 7
 Perry sought a court order compelling the presence of several people in Alabama who he claimed were alibi witnesses. The gist of Perry's defense was that he was in Alabama at the time of the murders in Van Buren, which is in northwest Arkansas. The State presented seven witnesses who placed Perry in and around the Staton Jewelry Store on the day of the crime and the few days immediately preceding it. Perry proffered eleven witnesses who would place him in Alabama at various times. The state trial court offered to pay the travel expenses for Perry's witnesses but refused to enable Perry to issue subpoenas to compel their live testimony. Seven of the eleven witnesses appeared voluntarily and testified; the testimony of the other four was read into the record from their depositions or from their responses to written interrogatories. The State paid for the cost of the depositions and interrogatories.
 
 
 8
 The sixth amendment provides, inter alia, that "[i]n all criminal prosecutions the accused shall enjoy the right to * * * have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Before a criminal defendant is entitled to compulsory process, however, he must establish that the testimony of the witnesses whose presence he wishes to compel is favorable and material. United States v. Valenzuela-Bernal, 458 U.S. 858, 868, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982).
 
 
 9
 The state trial court ruled that compulsory process was unavailable because its subpoena power was limited to the two counties comprising the state judicial district in which it sat. As the State conceded at oral argument, this ruling was erroneous. The availability of compulsory process for out-of-state witnesses is well settled under Arkansas law. See Mackey v. State, 279 Ark. 307, 651 S.W.2d 82, 86 (1983) (defendant in capital felony cases has right to unlimited number of out-of-state witnesses if material); Henry v. State, 278 Ark. 478, 647 S.W.2d 419, 427, cert. denied, 464 U.S. 835, 104 S.Ct. 121, 78 L.Ed.2d 119 (1983); Wright v. State, 267 Ark. 264, 590 S.W.2d 15, 18 (1979); see also Ark.Stat.Ann. Secs. 43-2001, 43-2002, 43-2006 and commentary.
 
 
 10
 The district court found that the state trial court's error did not warrant habeas relief because Perry had failed to show that the absent witnesses were material. We agree. Perry could not establish that the four absent witnesses were material, because their testimony either was not inconsistent with that of the State's witnesses, or, in the case of the fourth absent witness, Glenda Perry, Perry's ex-wife, was merely a weaker repetition of the testimony of witnesses who did appear at trial.
 
 
 11
 First, we reject Perry's contention that there must be a per se rule for determining the materiality of a witness, for what is material in the context of one case may be immaterial in another. Second, the testimony of three of the absent witnesses was irrelevant to the question of Perry's guilt, since they did not place Perry somewhere other than northwest Arkansas on the day of the crime. Glenda Perry's testimony placing Perry in Alabama close to the day of the crime is immaterial because when viewed in the context of the testimony of the other witnesses and the evidence adduced at trial, there is no " 'reasonable likelihood that the testimony could have affected the judgment of the trier of fact.' " United States v. Bagley, 473 U.S. 667, 681-82, 105 S.Ct. 3375, 3383-84, 87 L.Ed.2d 481 (1985) (Blackmun, J.) (quoting Valenzuela-Bernal, 458 U.S. at 874, 102 S.Ct. at 3450).
 
 
 12
 Bearing in mind that the crime occurred on September 10, 1980, the testimony for the State was as follows. Chantina Ginn, temporary traveling companion of Perry's accomplice, Richard Anderson, testified that Anderson and Perry, who was using the alias "Damon Peterson," left their campsite at Beaver Lake, Arkansas, on either the 8th or 9th of September with a gun, a rope, a light brown woman's wig, and a change of clothes. Ginn also testified that the two men returned with two duffel bags full of jewelry on the night of the 10th. Ginn identified Perry as the man who called himself Damon Peterson. Another witness corroborated Ginn's testimony that Perry was camping at Beaver Lake, Arkansas, in early September.
 
 
 13
 Pat Etier testified that she met a man calling himself Damon Peterson in Van Buren, Arkansas, on the afternoon of September 9. She identified Perry as Peterson and stated that when she met him on September 9, he was wearing a light brown woman's wig. According to Etier's testimony, Perry spent that night with her at her home in Fort Smith, several miles from Van Buren. She drove him to Anderson's motel in Fort Smith at about 8:00 on the morning of the 10th.
 
 
 14
 Two Van Buren merchants testified that Perry was in their stores on September 9. In addition, Linda Godwin identified Perry as one of two men she saw at about 6:00 p.m. on September 10 walking hurriedly across the parking lot of the shopping center in Van Buren. Finally, Michael Jeffcoat testified that he sold a used car to Perry on September 11 in Rogers, Arkansas.
 
 
 15
 The testimony of three of the absent witnesses was of little or no assistance to Perry. The following testimony was received by deposition: one witness testified that a lay-away payment was made in Perry's account at a shop in Alabama on September 11, but that he did not see who made it and that it would not necessarily have had to be made by Perry; a clerk in a clothing store in Alabama testified that Perry and his daughter were in the shop sometime between the last week of August and the first two weeks of September; and the manager of the same store stated that Perry was in the store sometime during the "back to school" sale that was held in late August and early September. The district court characterized this testimony as "weak, uncertain, lacking in specificity, and not inconsistent with the state's case."
 
 
 16
 The in-court testimony of four of the witnesses and the deposition testimony of Glenda Perry did directly contradict the State's case.[2] Perry's younger daughter, Tonya, testified that Perry was in Alabama on September 1st, returned on the 8th and remained until the 10th. Perry's daughter Dawn gave essentially the same testimony, adding that she and Perry had shopped for clothes on the 9th. Wallace Perry, Perry's father, stated that Perry was at his house in Alabama on the night of the 10th and most of the day of the 11th, and Perry's mother, Eulene, corroborated that testimony. Glenda Perry testified that Perry was in Alabama on September 1st, returned "about a week later," and stayed for two or three days.
 
 
 17
 After finding that Glenda Perry's testimony was not as strong as the two daughters' testimony, however, the district court concluded that because the jury unequivocally rejected the testimony of Perry's daughters and parents, Glenda Perry's testimony was inconsequential. We agree. Although we recognize the value of live testimony, see, e.g., Barber v. Page, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968), and are aware that Arkansas provides for the presence of an unlimited number of material witnesses in a capital case, see Ark.Stat.Ann. Sec. 43-2001, we find no reversible error.
 
 
 18
 Perry presented four live witnesses who testified that Perry was in Alabama at the time of the robbery-murders. The testimony of each of those witnesses, with the possible exception of Eulene Perry's, was stronger, more certain, and more specific than Glenda Perry's. The jury was entirely unpersuaded by the testimony of these witnesses. We find that there was no reasonable likelihood that Glenda Perry's live testimony would have altered this outcome, and therefore her testimony was not material. See Pennsylvania v. Ritchie, 480 U.S. 39, 58, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987); Valenzuela-Bernal, 458 U.S. at 874, 102 S.Ct. at 3450.
 
 
 19
 Glenda Perry's testimony is also immaterial in light of the physical evidence against Perry, which the district court accurately characterized as "overwhelming." The following evidence was recovered by police from the camper Perry had been using at the time of the crime: a gold coil resembling ones taken from the Statons' store, a buffalo nickel with an identifiable mark on it that Ruth Staton testified she kept in the store, and a jewelry price tag in the handwriting of Karen Staton, as well as other incriminating evidence. A search of Perry's Cadillac, later recovered at a salvage yard, revealed a single page of the Van Buren phone book listing Kenneth Staton's phone number, and a copy of the September 11, 1980, edition of the Northwest Arkansas Morning Times, the headline story of which concerned the Staton robbery and murders. A search of the area surrounding the Beaver Lake campsite for which a user permit was issued to "Damon Peterson" uncovered a rope that a crime lab expert testified possessed characteristics similar to the rope that was used to bind the hands and feet of Kenneth Staton and his daughter. Finally, when Perry was arrested he had two rings in his possession. One was identified by Ruth Staton as identical to her husband's wedding band. The other was identified by Karen Staton as part of the inventory from the jewelry store.
 
 
 20
 This evidence incontrovertibly linked Perry to the robbery and murders. Accordingly, we are convinced that there was no reasonable likelihood that the live testimony of Glenda Perry would have affected the jury's judgment. As the absent witnesses were not material, the compulsory process clause was never triggered and thus was not violated.[3]
 
 II.
 
 21
 Perry next argues that he was denied a trial by an impartial jury when the state trial judge refused to grant a second change of venue on the ground of prejudicial pretrial publicity. At the hearing on the first motion for a change of venue on March 31, 1981, Perry introduced evidence of the nature of the media coverage. From the date of the crimes, September 10, 1980, to the date of Perry's arrest on September 26, and for some time thereafter, the coverage was extensive. Newspaper, television, and radio reports frequently described the crimes as brutal "execution-style" killings. It was reported that Perry had been using aliases and that he had been captured in a "shoot-out" with Florida police before being extradited to Arkansas. Perry's accomplice, Richard Anderson, who was tried separately, gave at least two interviews in which he stated that Perry did the actual killing and that he was afraid of Perry. Perry was also linked to organized crime. Most significant were reports that Perry was a suspect in a double murder in Georgia that had many of the characteristics of the Staton murders.
 
 
 22
 After hearing this evidence, the state trial court, laboring under the misconception that the Arkansas Constitution limited its authority to change venue only to a county within the Twelfth Judicial District of Arkansas in which it sat, granted a change of venue from Crawford County to Sebastian County. The Twelfth Judicial District is composed solely of Crawford and Sebastian Counties, which are immediately adjacent to each other, separated only by the Arkansas River. Both counties are served by the same newspapers and television and radio stations. In addition, although the Statons resided in Crawford County, their store was located in Sebastian County.
 
 
 23
 The district court found that the state trial court's interpretation of Arkansas law was erroneous. In another case arising out of Crawford and Sebastian Counties, and also originating in 1981, we noted that the Arkansas Supreme Court had interpreted the Arkansas Constitution to allow interdistrict transfer as early as 1964, and certainly by 1978. Simmons v. Lockhart, 814 F.2d 504, 506-07 (8th Cir.1987) (citing Cockrell v. Dobbs, 238 Ark. 348, 381 S.W.2d 756 (1964) and Swindler v. State, 264 Ark. 107, 569 S.W.2d 120 (1978)), cert. denied, --- U.S. ----, 108 S.Ct. 1489, 99 L.Ed.2d 717 (1988). The Arkansas Supreme Court affirmed this interpretation in Perry's own appeal, see Perry, 642 S.W.2d at 868, and in an appeal by Perry's accomplice, see Anderson v. State, 278 Ark. 171, 644 S.W.2d 278, 281 (1983).
 
 
 24
 The state trial court's error was rendered nugatory, however, by its rulings on Perry's two subsequent motions for transfer of venue. At the second hearing for a change of venue on May 7, 1981, after the trial had already been transferred to Sebastian County, the state trial court held that although it considered itself limited to a change of venue within the Twelfth Judicial District,
 
 
 25
 [t]he Court still believes that the change of venue in this district [will] enable [Perry] to receive a fair trial in this Court. I think ultimately what it will depend upon is, and the Court can not decide that at this time, is the selection of the jury. It might be that it would be impossible to impound a jury in Sebastian County. * * * [W]e can see what develops and the point can be raised again. * * * I am basing my holding upon the explicit provisions of the law and do not believe that there has been a sufficient showing made by the defendant today that would authorize the Court to transfer the case outside the district.
 
 
 26
 State Trial Tr. at 1056-57.
 
 
 27
 Perry renewed his motion for a second change of venue after the jury had been selected. In denying the motion, the state trial court found:
 
 
 28
 [W]e have examined approximately sixty-six [potential] jurors, during the selection of this jury. Out of the entire sixty-six no juror expressed any opinion that they had in regard to the guilt of this defendant that they derived from any of the news media whatever. * * * [Most of the seated jurors] were not familiar at all with any of the facts in this case, so the Court thinks [that] changing venue from Crawford to Sebastian County * * * has insured this defendant * * * a completely fair and impartial trial before a fair and impartial jury[.]
 
 
 29
 State Trial Tr. at 2116-17. Thus, whatever the state trial court believed the applicable Arkansas law to be, it based its denial of a second change of venue on the fact that Perry had established no prejudice resulting from publicity.
 
 
 30
 In Simmons, we held that although the state trial court had misinterpreted Arkansas law on transfer of venue, there was no reversible error because the state trial court also based its holding on its finding that the jury was impartial. See Simmons, 814 F.2d at 507-08. The state trial court's determination that Perry was not prejudiced by pretrial publicity is "an essentially factual conclusion * * * entitled to a presumption of correctness in federal habeas corpus proceedings unless the State court hearing was procedurally defective * * * or unless the federal court, upon considering the record as a whole, concludes that the factual determination was not fairly supported." Simmons, 814 F.2d at 508 (citing 28 U.S.C. Sec. 2254(d)(1)-(8)). After carefully reviewing the record, we agree with the district court that Perry was tried by an impartial jury.
 
 
 31
 Pretrial publicity can be the grounds for reversal only if it has actually prejudiced the jury. Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). The "fact that potentially prejudicial material was published does not conclusively demonstrate that a fair trial is impossible in the local area." Simmons, 814 F.2d at 509. "It is not required * * * that the jurors be totally ignorant of the facts and issues involved. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961) (citations omitted); Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984) (prejudice established when the jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant"). Perry points to nothing in the record that suggests that the jury was partial, as he is required to do. Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Without exception, all of the seated jurors and alternates expressed no opinion as to Perry's guilt or innocence before the trial. In fact, as a whole the jurors professed to know extremely little about the facts of the case. At the close of the voir dire, when defense counsel renewed the motion for a second change of venue, he acknowledged, "there is little question, to be frank * * * that the responses of the [venirepersons] would indicate a lack of specific knowledge on their part, * * * about matters which have been published in the newspapers and TV [sic]." State Trial Tr. at 2114.
 
 
 32
 Defense counsel based his renewed motion on the possibility of lingering subconscious prejudice as a result of exposure to the pretrial publicity. Although protestations of impartiality by prospective jurors are not conclusive, there is nothing in the record that makes the jurors' responses inherently incredible. See Simmons, 814 F.2d at 511; United States v. Faul, 748 F.2d 1204, 1215 (8th Cir.1984), cert. denied, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 632 (1985); Graham v. Mabry, 645 F.2d 603, 609 (8th Cir.1981).
 
 
 33
 Several factors combined to minimize the effect of the publicity. Perry's trial was not the only sensational murder trial in that area at that time, see Simmons, 814 F.2d at 508, and approximately ten months had elapsed between the crime and trial. See id. at 510 (the passage of seven months may allow "the initial heat and hostility to dissipate"). For the most part, the news coverage was an attempt at reporting facts rather than sensationalism or inflammatory editorials. Faul, 748 F.2d at 1212; Graham, 645 F.2d at 610. Much of the publicity concentrated on Anderson and, as trial approached, dealt primarily with pretrial procedure. Finally, it is most significant that the jurors were selected without objection from Perry, and none was challenged for cause. Simmons, 814 F.2d at 511.
 
 
 34
 For these reasons, we cannot say that the "atmosphere" of Perry's trial had been "utterly corrupted by press coverage." See Murphy, 421 U.S. at 798-99, 95 S.Ct. at 2035-36 (discussing Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)). Reports of involvement in other crimes can pose a significant threat to a trial's fairness, but do not by themselves require a new trial absent a showing of prejudice. See Simmons, 814 F.2d at 508. Regardless of the trial court's erroneous interpretation of Arkansas law, we find nothing in the record that indicates any prejudice on the part of a single juror. Because we find the jury was impartial, there was no need for a second change of venue. See Simmons, 814 F.2d at 511-12; Hobbs v. Lockhart, 791 F.2d 125, 128-29 (8th Cir.1986).
 
 III.
 
 35
 Perry also alleges that certain pretrial identification procedures were improper. He claims that the photo lineup was prejudicial because his photo showed him sitting up in a hospital bed, while the other photos in the array were standard mugshots. This argument fails. " '[C]onvictions based on eyewitness identification at trial following a pretrial indentification by photograph will be set aside * * * only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " United States v. Smith, 602 F.2d 834, 837 (8th Cir.), cert. denied, 444 U.S. 902, 100 S.Ct. 215, 62 L.Ed.2d 139 (1979) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)); see Cotton v. Armontrout, 784 F.2d 320, 322 (8th Cir.1986). The variation in the background of Perry's photograph did not create a substantial likelihood of misidentification.
 
 
 36
 In addition, the fact that several of the State's witnesses had unusually long periods of time in which to observe Perry enhances their reliability. See Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Any inconsistency in the identification of Perry by some of the witnesses can be accounted for by Perry's attempts to alter his appearance by shaving his mustache and wearing a wig. Perry concedes that the testimony of two of the most important identification witnesses, Ginn and Etier, was positive and consistent. In short, we find that the totality of circumstances demonstrates that the identification was reliable. See Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).
 
 
 37
 The district court also properly held that there was nothing in the record tending to indicate that the physical lineup was unduly suggestive and that it was not error to exclude the proffered testimony of Dr. Douglas Stevens, Perry's expert on the reliability of eyewitness identifications. See United States v. Blade, 811 F.2d 461, 465 (8th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 124, 98 L.Ed.2d 82 (1987); United States v. Purham, 725 F.2d 450, 454 (8th Cir.1984).
 
 IV.
 
 38
 We also find no error in the admission of graphic crime scene photos to corroborate the testimony of the witness who found the bodies and the doctor who performed the autopsies. See Kuntzelman v. Black, 774 F.2d 291, 292 (8th Cir.1985) (admission of photos is error only if not even "arguably relevant and probative" and will necessitate reversal only if so prejudicial as to amount to denial of due process or another specific constitutional right), cert. denied, 475 U.S. 1088, 106 S.Ct. 1474, 89 L.Ed.2d 729 (1986); Davis v. Campbell, 608 F.2d 317, 319 (8th Cir.1979). Viewed in the totality of the surrounding circumstances, the admission of these photos did not fatally infect the fairness of the trial.
 
 V.
 
 39
 The State's cross-appeal challenges the district court's application of Collins v. Lockhart, 754 F.2d 258 (8th Cir.), cert. denied, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), to Perry's case. Collins held that imposing the death penalty in a capital felony murder case on the basis of an aggravating circumstance that duplicated an element of the underlying felony was unconstitutional because such a process did not " 'genuinely narrow the class of persons eligible for the death penalty and * * * reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " Collins, 754 F.2d at 264 (quoting Zant v. Stephens, 462 U.S. 862 at 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)).
 
 
 40
 The district court found, in accordance with Collins, that the use of pecuniary gain as an aggravating circumstance was unconstitutional because it duplicated an element of the underlying felony.[4] As there was no way to discern the particular effect of the pecuniary gain factor on the jury's decision, the district court invalidated the death sentence despite the existence of another aggravating circumstance, see Collins, 754 F.2d at 267, and ordered the State to either retry the penalty phase or reduce Perry's sentence to life without parole.
 
 
 41
 We must decide whether our holding in Collins has been overruled by the Supreme Court's decision in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
 
 
 42
 Lowenfield followed the rule established in Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), that the constitutional requirement that a "capital punishment scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder,' " may be satisfied in two ways. See id. 108 S.Ct. at 554-55 (quoting Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)). Either a state legislature may explicitly restrict the definition of capital murder, or a jury may perform the narrowing function during the penalty phase by ascertaining whether any aggravating circumstances exist. Id. 108 S.Ct. at 555; Jurek, 428 U.S. at 270-71, 96 S.Ct. at 2955-56.
 
 
 43
 Lowenfield was convicted of first-degree murder under a Louisiana statute providing that " '[f]irst degree murder is the killing of a human being: * * * (2) when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.' " Id. at 553 (quoting La.Rev.Stat.Ann. Sec. 14:30(A) (West 1986)). In the penalty phase, the jury found a single aggravating circumstance: that Lowenfield had " 'knowingly created a risk of death or great bodily harm to more than one person.' " Id. at 554 (quoting La.Code Crim.P.Ann. Art. 905.4(d) (West 1984)). The jury then sentenced Lowenfield to death. Lowenfield argued that the sentence was unconstitutional because the Louisiana sentencing procedure did not narrow the group into a more specifically defined death-eligible class. Id. at 553.
 
 
 44
 The Supreme Court rejected this argument. Although the aggravating circumstance was an element of the underlying felony for which Lowenfield was convicted, the Supreme Court found that the Louisiana Legislature had narrowed the class of defendants eligible for the death penalty sufficiently "[t]o pass constitutional muster" by defining which homicides would be considered first-degree murder. Id. at 554. Accordingly, when the jury convicted Lowenfield of the "narrow" definition of first-degree murder drawn by the Louisiana Legislature, the constitutionally required narrowing function was satisfied. Id. at 555; see also Jurek, 428 U.S. at 270-71, 96 S.Ct. at 2955-56.
 
 
 45
 Collins construed a state sentencing system indistinguishable in any significant detail from Louisiana's. Like Louisiana, Arkansas has defined a specific group of crimes as capital murder eligible for the death penalty. See Ark.Stat.Ann. Sec. 41-1501 (Reissue 1977).[5] A comparison of Arkansas's definition of capital murder and Louisiana's definition of first-degree murder reveals that despite some variations they both perform the function of defining or limiting those crimes eligible for the death penalty. That the Louisiana statute requires the felony murder to be intentional, whereas the Arkansas statute requires only that the murder be the result of extreme indifference to human life, does not significantly distinguish the Arkansas statute from Louisiana's under the Lowenfield analysis, because both serve to narrow the class of death eligible murderers from all murderers. See Lowenfield, 108 S.Ct. at 554-55.[6]
 
 
 46
 Like Louisiana, Arkansas requires that the jury find that the aggravating circumstance or circumstances outweigh any mitigating factors and justify a sentence of death beyond a reasonable doubt. See Ark.Stat.Ann. Sec. 41-1302; La.Code Crim.Proc.Ann. art. 905.3. In addition, Arkansas's statutory list of aggravating circumstances replicates at least one of the required elements of the homicides eligible for the death penalty, just as the Louisiana statute does. Compare Ark.Stat.Ann. Sec. 41-1303 (aggravating circumstances) and Ark.Stat.Ann. Sec. 41-1501 (capital murder) with La.Code Crim.Proc.Ann. art. 905.4 (aggravating circumstances) and La.Rev.Stat.Ann. Sec. 14:30(A) (first-degree murder).
 
 
 47
 We conclude, therefore, that Collins can neither be harmonized with nor distinguished from Lowenfield, and we therefore deem it to have been overruled by Lowenfield.
 
 
 48
 The question remains whether Lowenfield retroactively applies to Perry's case.[7] The Supreme Court has held thatwhen a decision of [the Supreme] Court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively. In such cases, it has been a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered that rule in any material way.
 
 
 49
 United States v. Johnson, 457 U.S. 537, 548-49, 102 S.Ct. 2579, 2586, 73 L.Ed.2d 202 (1982); see also Yates v. Aiken, 484 U.S. 211, 108 S.Ct. 534, 537-38, 98 L.Ed.2d 546 (1988) (quoting Desist v. United States, 394 U.S. 244, 263-64, 89 S.Ct. 1030, 1041-42, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)).
 
 
 50
 Jurek v. Texas was the precedent on which Lowenfield was based. As recounted in Jurek, Texas had not adopted statutory aggravating circumstances, but instead had narrowed the categories of murders for which a death sentence could be imposed. The Court held that the narrowed categories of murders "serve[d] much the same purpose" as aggravating circumstances--they "require[d] the sentencing authority to focus on the particularized nature of the crime." Jurek, 428 U.S. at 270-71, 96 S.Ct. at 2955-56. The Court thus held that the class of death eligible persons could be narrowed either at the guilt or penalty phase of a trial. See Zant v. Stephens, 462 U.S. 862, 875 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983).
 
 
 51
 Lowenfield, therefore, did not announce a new rule.[8] It merely applied a rule that had been announced in Jurek: "We see no reason why [the] narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in Jurek v. Texas establishes this point." Lowenfield, 108 S.Ct. at 554 (citation omitted).
 
 
 52
 Viewed in the light of Jurek and Lowenfield, the Arkansas capital punishment procedure appropriately narrows the class of death eligible persons. Accordingly, Perry's sentence of death was valid under the eighth and fourteenth amendments and therefore must be reinstated.[9]
 
 
 53
 The order denying habeas relief on Perry's challenge to his conviction is affirmed. The order setting aside Perry's death sentence is reversed, and the case is remanded to the district court with directions to reinstate the death sentence.
 
 
 
 [1]
 This opinion cites to the Arkansas statutes in effect at the time of Perry's trial. The Arkansas Code of 1987 enacted no substantive alterations to the sections relevant to Perry's conviction
 
 
 [2]
 The other three in-court witnesses placed Perry in Alabama on August 30 or September 1
 
 
 [3]
 Because we find the compulsory process clause was not violated, we do not address Perry's argument concerning the inapplicability of harmless error review
 
 
 [4]
 Perry was convicted of capital felony murder for homicides committed during the course of a robbery. See Ark.Stat.Ann. Sec. 41-1501. We have held that the motive of pecuniary gain is an element of robbery even though it does not appear in the literal language of the Arkansas robbery statute, Ark.Stat.Ann. Sec. 41-2103. See Collins, 754 F.2d at 263. Although Perry was tried under a revised version of section 41-2103 different from the version analyzed in Collins, the commentary to the 1977 revision reveals that it was intended to expand the definition of robbery and does not indicate that pecuniary gain is no longer an element of robbery in Arkansas. Therefore, when the jury convicted Perry of capital murder for killing during the course of a robbery, it had already established the aggravating circumstance of pecuniary gain beyond a reasonable doubt
 
 
 [5]
 Ark.Stat.Ann. Sec. 41-1501 provides in relevant part:
 (1) A person commits capital murder if: (a) acting alone or with one or more other persons, he commits or attempts to commit rape, kidnapping, arson, vehicular piracy, robbery, burglary, or escape in the first degree, and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life;
 * * *
 (3) Capital murder is punishable by death or life imprisonment without parole[.]
 La.Rev.Stat.Ann. Sec. 14:30(A), provides in part:
 "First degree murder is the killing of a human being:
 "(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;
 * * *
 "(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person[.]
 Under Louisiana law, a defendant convicted of first-degree murder faces a sentence of either death, or life without the possibility of parole, probation, or suspension of sentence. La.Rev.Stat.Ann. Sec. 14:30(C).
 
 
 [6]
 Capital felony murder is not limited to intentional killing, but may also include death that results from extreme indifference to human life, so long as the defendant participated substantially in the underlying felony. See Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)
 
 
 [7]
 Several defendants received the benefit of Collins while Perry's habeas appeal was in the district court. See Collins, 754 F.2d at 258; Ruiz v. Lockhart, 806 F.2d 158 (8th Cir.1986) (involving two defendants, Ruiz and Denton); Woodward v. Sargent, 806 F.2d 153 (8th Cir.1986). These defendants, however, were in a different position than Perry. Collins, Ruiz, and Woodward were all argued before the same panel on May 15, 1984. Collins was decided on January 31, 1985. Following the Supreme Court's denial of certiorari in Collins, Ruiz, Denton, and Woodward were given the benefit of the Collins holding. (We are informed by the State that Ruiz and Denton were resentenced in a second proceeding and again received the death penalty; the State abandoned its attempts to obtain the death penalty against Collins and Woodward.) Perry, however, was not a contemporary of Collins. Not until May 14, 1986, did Perry first raise the double-counting issue in an amendment to his petition for habeas corpus. We cannot now give Perry the benefit of Collins. Although the Supreme Court did not disturb Collins when it had the explicit opportunity to do so in 1985, it has since, as we hold today, implicitly overruled that case in Lowenfield. Perry, therefore, does not have the benefit of an undisturbed Collins that Collins, Ruiz, Denton, and Woodward had
 
 
 [8]
 The Supreme Court recently held that new constitutional rules of criminal procedure should not be applied to cases that were final before the new rule was announced. Teague v. Lane, --- U.S. ----, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The Court expressed no opinion, however, regarding the application of its holding in the capital sentencing context. Id. 109 S.Ct. at 1077 n. 3
 
 
 [9]
 Because we find that Collins has been overruled and that the rule of Jurek and Lowenfield applies, the issues the State raised on cross-appeal are now moot