Richard Wayne SNELL, Appellant,

v.

A.L. LOCKHART, Appellee.

Richard Wayne SNELL, Appellee,

v.

A.L. LOCKHART, Appellant.

Nos. 92–2157, 92–2265.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1993.

Decided Jan. 28, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 22, 1994.

Jeffrey Rosenzweig, Little Rock, AR, argued (G. William Currier and Beth Haroules, New York City, and John J. McAvoy and Harriet Ann Robinson, Washington, DC, on the brief), for appellant/cross-appellee.

Jackie W. Gillean, Deputy Atty. Gen., Little Rock, AR, argued, for appellee/cross-appellant.

Before McMILLIAN, Circuit Judge, HENLEY; Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

HENLEY, Senior Circuit Judge.

Richard Wayne Snell appeals the judgment of the district court[1] partially denying his petition for a writ of habeas corpus. A.L. Lockhart, the Director of the Arkansas Department of Correction, cross-appeals to the

1. The Honorable Bruce M. Van Sickle, United States Senior District Judge for the District of North Dakota, sitting by designation.

extent the district court granted Snell's petition. We affirm in part and reverse in part.

## I.

On November 3, 1983, William Stumpp was murdered during a robbery of his pawnshop in Texarkana, Arkansas. The case baffled authorities for almost eight months, but on June 30, 1984, Snell was apprehended in Broken Bow, Oklahoma, after he shot and killed Arkansas State Trooper Louis Bryant on a western Arkansas highway. Though Snell was originally charged only with the Bryant murder, investigators soon uncovered evidence linking him to the Stumpp murder. After a widely publicized trial, a jury convicted Snell for the murder of Trooper Bryant and sentenced him to life imprisonment without parole.[2] On November 1, 1984, the same day he was sentenced in the Bryant case, prosecutors charged Snell for the murder of Stumpp. The Stumpp trial took place between August 13 and August 15, 1985, in Miller County Circuit Court in Texarkana. Court appointed attorneys Marshall Moore and Rick Shumaker represented Snell. At the conclusion of the trial, the jury convicted Snell of capital murder and sentenced him to die by lethal injection.

The Arkansas Supreme Court affirmed the conviction and sentence. *Snell v. State*, 721 S.W.2d 628 (Ark.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 202, 98 L.Ed.2d 153 (1987). The court later denied Snell's petition for post-conviction relief pursuant to Arkansas Criminal Procedure Rule 37.[3] *Snell v. State*, No. CR 85–206, 1988 WL 81730, (Ark. Oct. 3, 1988) (per curiam), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989).

On June 16, 1989, Snell filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1977). After seven days of hearings

the district court denied Snell's petition as to his conviction. However, the court found that Snell's sixth amendment right to effective assistance of counsel had been violated because his attorneys had not objected to a jury instruction concerning the "pecuniary gain" aggravating circumstance. The district court therefore vacated Snell's death sentence and remanded to the Arkansas Supreme Court for appellate reweighing. *Snell v. Lockhart*, 791 F.Supp. 1367 (E.D.Ark. 1992). The parties subsequently appealed to this court.

We review the district court's legal conclusions under a de novo standard. *Prince v. Lockhart*, 971 F.2d 118, 120 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1394, 122 L.Ed.2d 768 (1993). However, we reverse the court's factual findings only if clearly erroneous. *Id.*

## II.

■ Snell asserted in his habeas petition that his rights to a fair trial and an impartial jury under the sixth and fourteenth amendments were violated due to massive amounts of pretrial publicity and the failure of the trial court to grant a change of venue. The district court rejected the claim because the record established that all jurors were impartial. On appeal, Snell initially asserts that prejudice should be presumed because the pretrial publicity in Miller County was so pervasive and inflammatory that a fair trial was impossible. He notes that during the thirteen months between the Bryant murder and the Stumpp trial local newspapers disseminated approximately two hundred articles relating to either the Bryant or Stumpp killings, to Snell himself, to the survivalist movement with which he was associated,[4] or

---

**2.** The Bryant trial took place in Sevier County, which is north of Miller County, in which Texarkana is the county seat. Trooper Bryant was stationed in Sevier County, but lived in Texarkana.

**3.** The Arkansas Supreme Court abolished Rule 37 in 1989 but later reinstated it, though with different terms. Because the 1989 order abolishing the rule provided that anyone convicted and sentenced while the old rule was in effect could

proceed under that rule, any reference to Rule 37 in this opinion relates to the pre–1989 provision.

**4.** Though not an official member, Snell maintained close ties with The Covenant, The Sword, and The Arm of the Lord (CSA). A good summary of that organization's activities and purposes is found in *United States v. Ellison*, 793 F.2d 942 (8th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986), where we described the CSA as

to the deaths of four policemen in a traffic accident while en route to Bryant's funeral. Similar stories were also prominent on local television and radio. In the hearings below, Snell presented expert witnesses who testified that the publicity preceding Snell's trial was as great or greater than the publicity in virtually any other trial they had seen. However, the district court's opinion does not discuss Snell's argument that prejudice should be presumed without a review of the voir dire.

■ Prejudice may be "presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." *Coleman v. Kemp,* 778 F.2d 1487, 1490 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986); *see also Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). However, this principle is rarely applicable, being reserved for extreme situations. *Coleman,* 778 F.2d at 1490; *see also Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980) ("[O]nly in *Rideau,* itself, has the Supreme Court reversed a state court conviction on this basis of presumed prejudice deriving solely from pretrial publicity."), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). Indeed, two of the cases upon which Snell heavily relies involved something more than mere pretrial publicity. In *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court noted that in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), both of which Snell cites extensively, prejudice was indeed presumed. However, the Court found those cases to be exceptional not because of the amount of publicity but rather because of the "circus

atmosphere" of the trial proceedings themselves:

> The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. *They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.*

*Murphy,* 421 U.S. at 799, 95 S.Ct. at 2035 (emphasis added). The Eighth Circuit has been similarly reluctant to presume prejudice. *See, e.g., Perry v. Lockhart,* 871 F.2d 1384, 1391 (8th Cir.) ("Pretrial publicity can be the grounds for reversal only if it has actually prejudiced the jury."), *cert. denied,* 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989); *Simmons v. Lockhart,* 814 F.2d 504, 509 (8th Cir.1987) ("But the fact that potentially prejudicial material was published does not conclusively demonstrate that a fair trial is impossible in the local area. The press has a duty to report matters of legitimate public interest."), *cert. denied,* 485 U.S. 1015, 108 S.Ct. 1489, 99 L.Ed.2d 717 (1988); *United States v. McNally,* 485 F.2d 398, 403 (8th Cir.1973) ("Just because, however, there has been widespread or even adverse publicity is not in itself grounds to grant a change of venue."), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974).

As an initial matter, we note that the expert testimony Snell presented in the district court is not decisive. Though the testimony establishes that the amount of publicity was great, it does not persuade us that the publicity was sufficiently prejudicial or inflammatory. One witness did attempt to analyze the content of the newspaper articles by counting the number of words in the

---

a group dedicated to securing the supremacy of white Christians by promoting and engaging in defensive activities such as survivalism and paramilitary training, and in offensive activities intended to cause the downfall of the United States government. The group, variously known as the Christian Brothers Cedar, the Zarapeth–Horeb Church, and the Covenant, the Sword, and the Arm of the Lord (CSA),

occupied a 224–acre farm or compound in north central Arkansas, abutting the Missouri state line. [James] Ellison established the refuge in the mid–1970's as a religious retreat. In 1978, Ellison and the governing council of elders reoriented the group's activities to prepare for an envisioned downfall of the government and an accompanying civil war. *Id.* at 945.

articles creating either a negative image of Snell or a positive image of the victims. However, the record provides no evidence of what words the expert considered important. Moreover, the experts' comparisons between Snell's case and cases where venue was transferred are not conclusive, for we do not presume prejudice on collateral review merely because other trial judges would have granted a change of venue. A higher standard must be met when a petitioner seeks habeas relief on the basis of presumed prejudice. *See Murphy,* 421 U.S. at 804, 95 S.Ct. at 2038 (Burger, C.J., concurring) ("Although I would not hesitate to reverse petitioner's conviction in the exercise of our supervisory powers, were this a federal case, I agree with the Court that the circumstances of petitioner's trial did not rise to the level of a violation of the Due Process Clause of the Fourteenth Amendment."). To determine whether Snell has met that standard, we consider the circumstances preceding his trial.

As to the media reports themselves, the district court found that they were primarily factual rather than inflammatory. Upon review of the record, we conclude that that factual finding is not clearly erroneous, for the articles and broadcasts, though numerous, were fair, objective, and generally limited to a recitation of established facts. Few relevant editorials were released, and though several reports contained expressions of sadness or loss, very few hostile or vengeful statements were publicized. Furthermore, the media never represented that Snell's guilt was a foregone conclusion, as reports took care to describe him as a "suspect" or as the "alleged" culprit. The objective nature of the publicity is significant, for "[c]learly we must distinguish between largely factual publicity and that which is invidious or inflammatory." *United States v. Faul,* 748 F.2d 1204, 1212 (8th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 3501, 87 L.Ed.2d 632 (1985).

We also note that the Stumpp trial took place almost two years after Stumpp's murder and over nine months after the Bryant trial concluded. This court has recognized the benefits of a cooling off period. *Simmons,* 814 F.2d at 510 (seven months); *Per-*

*ry,* 871 F.2d at 1390 (ten months). In this case, relatively few articles directly relating to Snell were produced between January 1 and July 1, 1985. Though several articles and reports relating to other survivalists or to crime in general were produced throughout the interim period, most of these did not even mention Snell's name. Such reports related to Snell only indirectly and surely did not affect the public as did earlier reports. After July 1, publicity specifically about Snell and the impending trial intensified, but most of it concerned pre-trial motions and other procedural matters. Though a period of several months "is not long enough to allow complete forgetfulness of such a major event as this, . . . it may be long enough to allow the initial heat and hostility to dissipate, . . ." *Simmons,* 814 F.2d at 510.

■ In light of these considerations, we conclude that the media coverage in this case, though very thorough, was not so inflammatory as to require a presumption of prejudice. A review of the voir dire is necessary to determine whether Snell received a fair trial. Accordingly, we next consider Snell's argument that the jury was actually prejudiced against him.

■ In habeas proceedings, the determination by the trial judge that jurors are qualified is subject to a presumption of correctness. 28 U.S.C. § 2254(d); *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984). This is so because the issue is essentially one of credibility, where the demeanor of the prospective jurors becomes relevant. *Id.* Therefore, so long as there is fair support in the record for the state court's conclusions regarding the jurors' impartiality, those conclusions should not be overturned in habeas proceedings. *Id.*

■ Upon review of the voir dire, there is no doubt that many of those seated on the jury had knowledge either of facts regarding the Bryant case, which facts were ultimately ruled inadmissible, or of facts regarding the Stumpp case as told in media reports. However, knowledge of irrelevant or prejudicial facts is not dispositive, for "the accused is not entitled to an ignorant jury, just a fair one." *Simmons,* 814 F.2d at 510. "It is sufficient if the juror can lay aside his impression or

opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). After extensive voir dire, all those ultimately seated stated that they could lay aside any impression gained from the media and decide the case solely on the evidence presented. Furthermore, none of the twelve jurors claimed to have a definite preconceived opinion as to Snell's guilt.[5] Based on these statements, the trial court concluded that those seated as jurors were qualified.

As noted above, this is not a case where the pretrial publicity was so inflammatory and pervasive "as to make juror's claims of impartiality unbelievable." *Simmons,* 814 F.2d at 511. Nor does the record demonstrate such hostility within the venire that "even the few jurors who claim to be able to disregard what they have heard must be presumed to have been irretrievably poisoned by the publicity." *Id.* A general voir dire was initially conducted in which many veniremen were questioned and eight were excused for bias. After the general questioning, individual voir dire began. Of the forty-one prospective jurors individually questioned, ten were excused because they had formed an opinion or knew facts they could not set aside. No other venireman expressed a definite opinion as to Snell's guilt. Though several had heard or read news reports, all stated that they could decide the case solely upon the evidence. Thus, eighteen of at least forty-nine prospective jurors expressed bias against Snell. Such numbers do not establish a "pattern of deep and bitter prejudice." *Compare Faul,* 748 F.2d at 1213 (No prejudice where 50% of veniremen were excused because they could not be impartial) *and United States v. Blanton,* 719 F.2d 815, 820 (6th Cir.1983) (70 out of 92 veniremen excused was not reflective of prejudice), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984), *with Irvin,* 366 U.S. at 727, 81 S.Ct. at 1645 (Prejudice shown where 86% of venire of 430 expressed opinion as to guilt). Consequently, the jurors' assurances that they could be fair and decide the case solely upon the evidence provides fair support for the trial court's determinations.

### III.

Snell claims his right to due process was denied by prosecutorial misconduct in the

---

5. The questioning of Juror Brown is, at first glance, somewhat troubling. At one point, after Brown had explained what information he had gained from media reports, the following exchange took place:

> Q. From reading those articles and that information that you gave us, would you require Mr. Snell to present any evidence to disprove those articles, that information that you received out of those articles?
> A. I believe I would have to have evidence to show that there were circumstances other than the murder that caused those items, or whatever to be in his possession.

Snell's counsel then challenged for cause, after which the prosecution attempted to rehabilitate Brown by asking whether he could put aside all he had seen or read and base his opinion solely on the evidence. Brown said he could. The following discussion then took place:

> BY MR. MOORE:
> Q. Mr. Brown, I certainly appreciate your honesty. Did you not tell me that based upon the articles that you have read about the gun being in the van, what-have-you, that you would require Mr. Snell and require us to prove evidence to get that out of your mind. Wasn't that your testimony, sir?
> A. Let me clarify maybe to myself and you a little bit better. If in fact the report from whoever is responsible for making it to the Court shows that the gun was in his possession, and it was in fact the murder weapon, then I think I would personally have to have an explanation as to why that was there. That is what I'm saying.
> Q. But my question to you, and I'm trying to be sure that I heard your first answer correctly, is based upon your reading of the articles you stated that you would require us to prove evidence that it wasn't in his van.
> A. If it showed in the report that it was, then I would certainly want to have some reasoning there as to why it was not, or why it was there.
> MR. MOORE:
> All right, sir. Fine. I appreciate it.
> BY MR. JOHNSON:
> Q. Are you referring to a newspaper report, or are you referring to the evidence which you hear?
> A. I'm referring to the evidence now. Of course, all of it hinges back on the original article, that is why the thing was brought up in the first place.

Tr. 358–359. Though initially confusing, the latter portions of the dialogue indicate that Brown did not require Snell to present evidence refuting media reports. Rather, he would only need an explanation if certain evidence was in fact presented in court. Snell has failed to overcome the presumption arising from the trial court's determination that Brown was impartial.

misrepresentation of the state's plea agreement with William Thomas, a state witness and an alleged accomplice.

While the Stumpp case was pending, Thomas was under indictment in federal court for violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act. Thomas entered into a plea agreement with federal authorities and, in the course of fulfilling that agreement, disclosed facts concerning the Stumpp murder. Asa Hutchinson, the United States Attorney prosecuting Thomas, then began to act as intermediary between Thomas' lawyer and Kirk Johnson, the state prosecutor in the Stumpp case. In a letter to Thomas' lawyer, Hutchinson expressed his belief that Johnson would agree not to press charges against Thomas in state court in exchange for testimony implicating Snell. Thomas' lawyer, wishing to make a deal, forwarded a copy of this letter to Johnson. Johnson never refuted, in writing, Hutchinson's impression that no state charges would be filed. However, he met with Thomas and later notified Thomas' attorney that in exchange for the testimony "the State would not recommend any time additional to that which Mr. Thomas would receive in Federal Court." Ex. 1005.

At trial, Thomas testified that on November 3, 1983, he, Snell, and Stephen Scott went to Stumpp's pawnshop to rob it, that he stayed outside while Snell and Scott went into the shop, and that Snell came out and claimed to have shot Stumpp. The state's agreement with Thomas was brought out on direct examination, when Thomas explained that the state would seek no time in addition to what he would get in federal court and that his maximum exposure there was thirty years. Thomas reiterated this statement on cross-examination, and the prosecution mentioned the thirty year exposure in argument. In actuality, Thomas' maximum exposure in federal court was twenty years. He was never charged for murder in state court.

Snell claims the prosecutor made two misrepresentations. First, he claims Johnson led the jury to believe that though Thomas would receive no additional time, the state would charge him with murder. The second alleged misrepresentation concerned the testimony that Thomas could get up to thirty years when in fact his maximum exposure was twenty years.

As to the first alleged misrepresentation, Snell contends the evidence shows Johnson never intended to charge Thomas, for Hutchinson's letter stated that to be the case, and Johnson never refuted Hutchinson's belief. However, Johnson testified before the district court that he must have called either Hutchinson or Thomas' lawyer to rectify the misunderstanding in Hutchinson's letter. He claimed that he always intended to charge Thomas but that he decided to wait until he had used Thomas as a witness in the prosecution of Scott, the third person involved in Stumpp's murder, because he did not want to remove Thomas' incentive to testify. Soon thereafter, Johnson's bid for reelection as prosecutor was defeated, so he was then without authority to press charges. He claimed that his successor must have forgotten about Thomas' case. As to the discrepancy between the thirty years and twenty years maximum exposure, no explanation is provided, but the state notes that it was actually Thomas, not the prosecutor, who first made reference to the thirty year period.

Because Snell was not aware of the terms of Thomas' agreement during his state proceedings, his prosecutorial misrepresentation claim was not presented to the Arkansas courts. The district court therefore held that the claim was procedurally defaulted. *Snell*, 791 F.Supp. at 1373. The court then held that though there was cause for the default, Snell had failed to establish prejudice. This ruling was based on the court's factual finding that the prosecutor had not misrepresented the state's deal with Thomas. Snell now contends that this finding is clearly erroneous and that he was prejudiced by the misrepresentations.

■ We follow a four step analysis when deciding whether to consider a claim not presented to a state court. *Smittie v. Lockhart*, 843 F.2d 295, 296 (8th Cir.1988); *Cox v. Lockhart*, 970 F.2d 448 (8th Cir.1992). First, we determine whether the claim was in fact "fairly presented" to the state courts as required by 28 U.S.C. § 2254(b); *Anderson v.*

*Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982). Then, if the claim was not fairly presented, we determine whether "the exhaustion requirement has nonetheless been met because there are no 'currently available, non-futile state remedies', through which the petitioner can present his claim." *Smittie,* 843 F.2d at 296 (quoting *Laws v. Armontrout,* 834 F.2d 1401, 1414 (8th Cir.1987), *aff'd on rehearing,* 863 F.2d 1377 (8th Cir. 1988), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989)). If there are no available state remedies, the final two steps of the analysis involve determinations of whether petitioner can show adequate cause for failing to raise the claim and actual prejudice resulting from the state court's failure to consider the claim. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Smittie,* 843 F.2d at 296. "The petition must be dismissed unless the petitioner succeeds at each stage of the analysis." [6] *Id.*

■ There is no dispute here that Snell did not fairly present his prosecutorial misconduct argument to the Arkansas courts. Moreover, due to the time which has elapsed, Snell has no available state remedy.[7] Assuming arguendo that Snell was not aware of, and could not have discovered, the factual basis for the claim when his case was before the Arkansas Supreme Court, we agree with the district court that Snell has established cause. *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397

(1986). We therefore consider the question whether Snell can establish actual prejudice.

In this case, the prejudice inquiry requires an initial factual finding that the prosecutor did indeed misrepresent the plea agreement with Thomas. But because the district court found otherwise, we can reverse only for clear error. *Prince,* 971 F.2d at 120.

As to the allegation that Johnson never intended to bring state charges against Thomas, we find that Johnson's testimony before the district court constitutes sufficient evidence to support the court's finding. However, it is undisputed that while Thomas' actual maximum exposure was twenty years, all of the evidence before the jury indicated he could get up to thirty years. Therefore, as to this particular discrepancy, the district court was clearly erroneous in finding that "the evidence of the plea bargain presented to the jury was the truth." *Snell v. Lockhart,* 791 F.Supp. at 1374. We now consider Snell's argument that he was actually prejudiced by this misrepresentation.

Snell argues that had the jury known Thomas would serve no more than twenty years, they would have deemed his testimony less credible. Moreover, he claims the discrepancy may have affected the sentence, for if the jurors had known exactly how leniently the accomplice was being treated, they may have been more lenient with the alleged trigger man. Snell emphasizes that only one juror need object to the death penalty in order to preclude its imposition.

**6.** In extraordinary cases, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent," a federal court may consider a defaulted claim even if the cause and prejudice test is not met. *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2650, 91 L.Ed.2d 397 (1986). Snell has not argued that this fundamental miscarriage of justice exception applies, nor could he, for his prosecutorial misconduct argument only affects the testimony of one witness. Considering the overwhelming evidence of guilt, Snell cannot establish any reasonable probability that he is actually innocent. Likewise, Snell cannot show that the death sentence imposed upon him resulted in a fundamental miscarriage of justice, for even without Thomas' testimony the jury would have found the same two aggravating circumstances. *See Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2523, 120 L.Ed.2d 269 (1992) ("[T]he 'actual innocence' requirement must focus on those elements which render a defendant eligible for the death penalty, and not on additional mitigating evidence....").

**7.** Former Rule 37.2(c) of the Arkansas Rules of Criminal Procedure required a motion for post-conviction relief to be filed "within three years of the date of commitment, unless the ground for relief would render the judgment of the conviction absolutely void." However, grounds sufficient to avoid the three year limit are extremely limited. *Smittie,* 843 F.2d at 297. In fact, "[e]rror sufficient to void a conviction under Arkansas law appears to be limited to errors that prevent retrial." *McDougald v. Lockhart,* 942 F.2d 508, 511 n. 5 (8th Cir.1991). Snell's prosecutorial misconduct claim does not meet this standard, so the three year rule applies. Any Rule 37 petition is therefore barred.

■ To establish prejudice, Snell must show that the misrepresentation denied him "fundamental fairness". *Murray*, 477 U.S. at 494, 106 S.Ct. at 2648. Though "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), the false testimony in this trial did not deny Snell fundamental fairness for two reasons. First, we believe the prosecution did not knowingly elicit the testimony, for Thomas, not the prosecutor, first interjected that he could get thirty years. Though the prosecutor did not correct Thomas' statement during the examination, he apparently either did not know the exact numbers or forgot them during the pressure of examination.

Second, there is no reasonable probability that the false testimony affected the jury's judgment either as to guilt or sentence. The difference between a twenty year exposure and a thirty year exposure is simply too slight to raise any reasonable doubt that the jury would not have believed Thomas and convicted Snell, especially considering the evidence corroborating Snell's guilt. The same can be said as to the sentence, for the jury found that death was appropriate due to the existence of aggravating circumstances having nothing to do with Thomas. We can not reasonably believe that even one of the jurors would have disregarded these aggravating circumstances and imposed life without parole because the accomplice was only subject to twenty, rather than thirty, years. Consequently, we do not believe that Snell was prejudiced by any alleged prosecutorial misconduct.

## IV.

■ Throughout the trial, evidence was presented associating Snell with the CSA. Moreover, testimony was elicited regarding various CSA activities, such as the stockpiling of weapons, military training, and criminal actions by the CSA and its members. Though Snell's trial counsel objected to some of the evidence on relevancy grounds, most of it was admitted. On direct appeal, Snell again objected to the admission of the evidence, arguing primarily that the evidence was irrelevant and unduly prejudicial. However, counsel made one brief reference to federal law, arguing in the appellate brief that admission of the evidence "made a mockery" of the due process clause. Ex. 46 at S0914. The Arkansas Supreme Court upheld the admission of the evidence under the Arkansas Rules of Evidence but did not mention the constitutional issue. *Snell v. State*, 721 S.W.2d at 634–37.

Snell made the same due process argument in his habeas petition. The district court held, however, that the passing reference to the due process clause in Snell's appellate brief was insufficient to properly present the constitutional issue to the Arkansas Supreme Court and that the claim was therefore procedurally defaulted. *Snell v. Lockhart*, 791 F.Supp. at 1372. The district court then held that though ineffective assistance had been alleged as cause for the default, Snell had not shown that counsel was indeed ineffective. *Id.* at 1372. The court also noted that Snell failed to establish prejudice. *Id.* at 1373.

As explained above, 28 U.S.C. § 2254(b) requires a petitioner to fairly present all issues to the state courts before seeking habeas relief. *Anderson*, 459 U.S. at 6, 103 S.Ct. at 277. Thus, "the petitioner must include the same facts and legal theories to the state court that he seeks to present to the federal court...." *Laws*, 834 F.2d at 1412; *Rust v. Hopkins*, 984 F.2d 1486, 1490 (8th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993). There is no dispute that Snell presented sufficient facts to the Arkansas Supreme Court. The only question is whether the following statement was sufficient to fairly apprise the Arkansas Supreme Court of Snell's due process claim: "To deny appellant a new trial as a result of the irrelevant and prejudicial testimony being admitted into evidence would make a mockery out of the due process clause of the United States Constitution." Ex. 46 at S0914.

The district court relied on *Thomas v. Wyrick*, 622 F.2d 411 (8th Cir.1980), in holding that this was insufficient. In that case, the petitioner's brief stated only that the trial court's alleged error "denied a fair trial." *Id.* at 412. We held that that bare statement failed to raise a fourteenth amendment issue because "no federal constitutional ground was ever presented to the state courts...." *Id.* at 413; *see also McDougald v. Lockhart*, 942 F.2d 508, 510 (8th Cir.1991) ("Explicit citation to the Constitution or to a federal case is necessary for fair presentation of a Constitutional claim to state courts.").

In this case, Snell's appellate counsel certainly could have made the constitutional issue more easily discernible. Nevertheless, we believe the legal basis for the claim was fairly presented, for unlike *Thomas*, the brief in this case explicitly cited the due process clause of the Constitution. The Arkansas Supreme Court could easily have recognized that included within the myriad claims of undue prejudice was a claim that the prejudicial testimony, when cumulated, amounted to a denial of due process. We therefore turn to the merits of Snell's claim that admission of the CSA evidence violated his rights to due process.

■ A state court's evidentiary ruling warrants habeas relief where the asserted error denies due process. *Wood v. Lockhart*, 809 F.2d 457, 460 (8th Cir.1987). Such a denial occurs where the evidentiary ruling is "so 'gross', ..., 'conspicuously prejudicial', ..., or otherwise of such magnitude that it fatally infected the trial and failed to afford petitioner the fundamental fairness which is the essence of due process...." *Maggitt v. Wyrick*, 533 F.2d 383, 385 (8th Cir.) (citations omitted), *cert. denied*, 429 U.S. 898, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976); *see also Kerr v. Caspari*, 956 F.2d 788, 790 (8th Cir.1992); *Wood*, 809 F.2d at 460.

■ Under this standard, the CSA evidence admitted at Snell's trial did not deny him due process. For the most part, we agree with the Arkansas Supreme Court that the evidence was relevant and that its probative value outweighed any prejudice. In particular, testimony about an aborted robbery of a pawnshop in Springfield, Missouri, was relevant to proving motive, intent, and preparation, for the Springfield plans were almost identical to what occurred in Texarkana. Similarly, testimony regarding other illegal activities by the CSA was relevant as to motive, for it established that the CSA financed its operations through theft, robbery, and fraud. Though Snell makes much of the fact that he was never an official member of the CSA, the record firmly establishes his close association with that group.[8]

■ Though some of the CSA evidence may have been far removed from the essential elements of the case, admission of such evidence was not so gross or conspicuously prejudicial as to rise to the level of a constitutional violation. Furthermore, "[no] due process violation exists, even if the evidence was erroneously admitted, if other evidence of guilt is so overwhelming that the error is harmless." *Wedemann v. Solem*, 826 F.2d 766, 767 (8th Cir.1987); *see also Hobbs v. Lockhart*, 791 F.2d 125, 128 (8th Cir.1986). Even if all improper references to CSA activity are stricken from the record, the remaining evidence is most substantial. First and foremost was William Thomas' testimony that he helped Snell rob Stumpp's pawnshop and that Snell admitted shooting Stumpp. A .22 calibre pistol established as the murder weapon was found in Snell's possession, as was a .45 calibre automatic pistol positively identified as one of the guns stolen from the pawnshop. One CSA member testified that he had removed the serial number on the .45 at Snell's request. David McGuire stated that he had sought to trade for the .45 but that Snell refused, claiming "there is a dead man laying behind it." McGuire also testified that Snell told him he had shot Stumpp. CSA members testified that Snell brought a large amount of jewelry to the CSA com-

---

8. Snell cites *Dawson v. Delaware*, —— U.S. ——, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), where the Supreme Court held that the defendant's association with the Aryan Brotherhood could not be admitted at a sentencing hearing when that association was irrelevant to the issues of the case. However, *Dawson* is inapposite, for most of the CSA evidence in this case was relevant.

pound. Several members took rings for personal use, and one of these rings was identified in court. Further testimony tied Snell to a watch fob left on the scales in Stumpp's pawnshop. In sum, this evidence is more than sufficient to support Snell's conviction and sentence.

## V.

Snell claims that his sixth and fourteenth amendment rights to effective assistance of counsel were violated in several aspects of his trial. The governing standard comes from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), where the Supreme Court established a two part test. First, a convicted defendant "must show that counsel's performance was deficient." *Id.* at 687, 104 S.Ct. at 2064. This requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2065. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. At the very least, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

## A.

Snell argues that his trial counsel were deficient in the presentation of his change of venue motion and in various aspects of jury selection. He claims counsel failed to properly convey the extent and inflammatory nature of the pretrial publicity, failed to keep the venue issue alive throughout the trial, failed to seek appropriate pretrial rulings regarding the inadmissibility of the Bryant conviction, failed to adequately examine prospective jurors concerning their knowledge of prejudicial facts, and failed to exhaust all peremptory challenges as required by Arkansas law in order to preserve and assert jury selection error. However, a defendant cannot establish the prejudice element of *Strickland* unless "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, — U.S. —, —, 113

S.Ct. 838, 844, 122 L.Ed.2d 180 (1993). Because we have already concluded that Snell was tried by an unbiased jury, he cannot show that any deficient performance regarding change of venue or jury selection produced an unreliable or unfair result.

## B.

As discussed above, Snell argued before the district court that introduction of the CSA evidence violated his right to due process. Because the court found the issue to be procedurally defaulted, Snell then argued that ineffective assistance was cause for the default. He reiterates this argument on appeal. However, we have already held that the underlying due process claim was not in fact defaulted, so we need not reach the ineffectiveness argument. Nevertheless, we note that since the admission of the CSA evidence did not violate the due process clause, Snell cannot establish prejudice.

## C.

Snell next argues that his trial counsel were ineffective for failing to object to the prosecutor's closing argument during the guilt phase of the trial. He claims the prosecutor impermissibly expressed his opinion concerning the CSA and the lifestyles of its members, attributed their lifestyle to Snell though he was never a member, and then contrasted this with the lifestyle of the victim. He also claims the prosecution asserted facts not in evidence, misstated the evidence, improperly vouched for the credibility of state witnesses, and made remarks abusive of Snell and his counsel. According to Snell, he was prejudiced because, had his counsel objected to the prosecutor's comments, there is a reasonable likelihood that those comments would have been stricken from the record and that the jury either would not have convicted him or would not have sentenced him to die.

Even if portions of the prosecutor's closing argument were improper, Snell's claim fails, for there is no reasonable probability that, but for counsel's failure to object, the jury would have reached a different result as to either guilt or sentence. Perhaps if the evi-

dence had been close, prejudicial closing remarks could have swayed the jury one way or the other. But the evidence here overwhelmingly supported the jury's decisions, and this "reduced the likelihood that the jury's decision was influenced by argument." *Darden v. Wainwright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986). Moreover, the court instructed the jury that they were to make their decisions based solely on the evidence and that closing arguments were not evidence. Because Snell has not overcome the presumption that the jury acted according to law, he has not shown prejudice resulting from his attorney's failure to object. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *see Girtman v. Lockhart,* 942 F.2d 468, 474 (8th Cir.1991) (Defense counsel's failure to object to the prosecutor's misstatement of the law in closing does not constitute ineffective assistance where the court instructed the jury to only consider the evidence.).

### D.

■ Snell claims his trial counsel were ineffective for failing to object to the trial court's comment to the jury regarding parole. During sentencing deliberations, the jury sent a note to the judge asking whether life imprisonment without parole really meant no parole. The judge suggested a response stating that "the defendant will be incarcerated in the Arkansas Department of Correction for a period of life or until and unless the Governor of the State of Arkansas commutes the sentence to a term of years or a number of years." Ex. 39. Defense counsel agreed to the note, so it was sent to the jury. At the habeas hearings, trial counsel stated that they agreed to the note because they did not want to discourage the jury from considering life without parole.

The district court held that counsels' tactical decision was protected from review. *Snell,* 791 F.Supp. at 1385–86. Snell asserts that this is error because his trial counsel were ignorant of Arkansas law explicitly pro-

hibiting such comments without the consent of the defense, counsels' stated reasons for agreeing to the note make no sense, and the court's response was actually inaccurate because it did not mention that the governor can commute a sentence only after public notice and an opportunity to object.

Courts must be cautious when reviewing an attorney's strategic decisions after the fact. According to the Supreme Court:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel is unreasonable.

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Consequently a defendant must "overcome a 'strong presumption' that his counsel's actions constituted reasonable trial strategy under the circumstances." *Sanders v. Trickey,* 875 F.2d 205, 207 (8th Cir.) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989). We agree with the district court that Snell has not overcome this presumption. Obviously, when they sent the question to the judge, the jurors were still considering life without parole but were concerned that Snell could eventually be released. Counsel could have reasonably believed that the jury would probably impose death rather than imprisonment if they were left uninformed as to the likelihood that Snell would ever be free. Therefore, agreeing to the response was at the time a reasonable strategy. Counsel were not deficient even if in hindsight that strategy may not have been the wisest course of action.[9]

### VI.

■ Arkansas' capital murder trials are bifurcated. Ark.Code Ann. § 5–4–602 (Mi-

---

9. We also note that Snell cannot establish prejudice, for the Supreme Court concluded in *California v. Ramos,* 463 U.S. 992, 1004, 103 S.Ct. 3446, 3455, 77 L.Ed.2d 1171 (1983), that the reliability of a sentencing decision is not diminished by a trial court's comments regarding parole.

chie Supp.1993).[10] First, the jury determines guilt or innocence. Then, if the defendant is convicted of capital murder, a second proceeding begins, with opening and closing statements and an opportunity to present evidence relevant to either mitigating or aggravating circumstances. The same jury sits during the penalty phase and determines the appropriate punishment, whether it be life imprisonment without parole or death.

In the penalty phase of the Stumpp trial, the defense presented no mitigating evidence due to Snell's purported waiver of his right to do so. After closing statements, the jury retired for deliberations and returned with a sentence of death by lethal injection. The jury had found that two aggravating circumstances existed at the time of the murder. No mitigating circumstances were found to apply.

Snell challenges the district court's finding that his waiver was knowing and intelligent. He asserts that his trial counsel were totally unprepared to present mitigating evidence and that the trial court's examination of Snell was insufficient to establish a valid waiver. The examination, conducted in the absence of the jury, proceeded as follows:

THE COURT:

Mr. Snell, come around and have a seat on the witness stand. You may proceed questioning him as to mitigating circumstances.

BY MR. MOORE:

Mr. Snell, as you are aware, this is the time when you are capable of putting on mitigating circumstances. Do you understand that?

A. Yes, sir, I do.

Q. Mr. Shumaker and I have discussed this with you, have we not?

A. Well, yes, I guess you have, although I think it is a little late at this moment for me to say anything.

Q. What do you mean by that, sir?

A. I just mean that. At this point I don't care.

Q. In my conversation with you a few minutes ago, was it not your desire to not put on any mitigating circumstances?

A. That is correct.

Q. That is still your desire at this time, is that correct, sir?

A. That is correct.

THE COURT:

Mr. Snell, let me ask you for the Court's benefit and for the record much the same questions as Mr. Moore has asked you. To reiterate the question once again, you do not wish to put on any testimony pertaining to mitigating circumstances? Is that correct?

MR. SNELL:

No, your honor.

THE COURT:

You know what mitigating circumstances are, what that means?

MR. SNELL:

Yes, sir.

THE COURT:

Have a seat back where you were.

MR. SNELL:

Thank you, sir.

Trial Tr. 1135–1137.

This examination is rather brief, and Snell initially appears hesitant in his decision. Nevertheless, upon review of the entire record, we believe that Snell validly waived his right to present mitigating evidence. At the habeas hearings, Snell's trial attorneys testified that Snell had for months steadfastly refused to present mitigating evidence because he wanted to spare his family and friends from the trauma of such proceedings. They testified that the issue was discussed every time they met with Snell but that Snell's resolve only grew stronger as the trial date approached. They also asked Snell's wife to persuade him to change his mind, but even this approach failed. Furthermore, because Snell had gone through a previous capital murder trial where he did present mitigating evidence, he certainly understood both the

---

**10.** Though the Arkansas statutes with which we are concerned have remained unchanged in all relevant aspects since the time of Snell's trial, the law has been re-codified. For completeness, we will refer to the current code sections in the text and provide the former citations in footnotes. Ark.Code Ann. § 5–4–602 was formerly codified as Ark.Stat.Ann. § 41–1301 (1977).

purpose of such evidence and the effect which it would have on those testifying. Consequently, he made an informed and voluntary choice. We also believe the choice was intelligently made, for no evidence has been presented challenging Snell's competence. Indeed, his mental acuity was demonstrated by his participation as co-counsel in both of his trials.

Our conclusion that Snell made a knowing, voluntary and intelligent waiver is supported by *Singleton v. Lockhart,* 962 F.2d 1315 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 435, 121 L.Ed.2d 355 (1992). In that case, there was no discussion on the record between the defendant and either his attorney or the court. Moreover, the defendant had not previously been through a capital murder trial, so he was certainly no more knowledgeable of the purpose of mitigating evidence than was Snell. Nevertheless, on the basis of the trial attorney's habeas testimony, we held that the defendant had validly waived the right to present mitigating evidence. *Singleton,* 962 F.2d at 1322.

■ We also disagree with Snell's claim that his attorneys were deficient in preparing for the presentation of mitigating evidence. Though they may not have discussed the punishment phase with all those who could possibly be mitigation witnesses, they did talk to those who would have been the most important. At various times they discussed the issue with Snell's wife, and on at least one occasion they met with a group of Snell's family and friends. Though counsel admitted they would have needed a continuance if Snell had changed his mind after the guilt phase, the continuance would surely have been granted. Considering Snell's attorneys were faced with an uncooperative client who

remained so throughout the entire proceedings, we do not believe that their performance was deficient.

Snell further argues that an attorney should never accede to the desire of a client not to put on mitigating evidence. We cannot agree, for though we understand that many capital defendants express a desire to give up if they are convicted and that an attorney should try to persuade the client to act in his best interests, we do not believe that this duty removes the ultimate decision from the client. In *Singleton,* the attorney acceded to his client's wish not to present mitigating evidence. We held "that in the face of [the defendant's] knowing, intelligent waiver, [his attorney] was under no duty to do otherwise than he did." *Id.* at 1322.

## VII.

■ Arkansas' capital murder sentencing provisions require the jury to complete three verdict forms. *See* Ark.Model Criminal Instruction 1509. The first deals with aggravating circumstances; the jury checks off any of the statutory aggravating circumstances found to exist beyond a reasonable doubt. The second form similarly deals with mitigating circumstances; the jury identifies those which are unanimously found to exist, those which fewer than all of the jurors believe exist, and those for which there is evidence but which the jurors unanimously agree do not exist. There are six explicit statutory mitigating circumstances, Ark.Code Ann. § 5–4–605 (Michie 1987),[11] but juries may find anything to be a mitigating circumstance. The third verdict form deals with whether any existing aggravating circumstances outweigh any existing mitigating cir-

---

11. Formerly Ark.Stat.Ann. § 41–1304 (1977), which stated:

Mitigating circumstances shall include, but are not limited to the following:

(1) the capital murder was committed while the defendant was under extreme mental or emotional disturbance;

(2) the capital murder was committed while the defendant was acting under unusual pressures or influences or under the domination of another person;

(3) the capital murder was committed while the capacity of the defendant to appreciate the

wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse;

(4) the youth of the defendant at the time of the commission of the capital murder;

(5) the capital murder was committed by another person and the defendant was an accomplice and his participation relatively minor;

(6) the defendant has no significant history of prior criminal activity.

cumstances and whether the aggravating circumstances justify a death sentence.

The second form in the Stumpp trial did not list any of the six statutory mitigating circumstances. Rather, it provided blanks which the jury could fill in if they found mitigating circumstances. Snell contends that his counsel were ineffective for failing to ensure that the statutory mitigating circumstances were listed on the verdict form.

Because Snell validly waived his right to present mitigating evidence, none was presented. This is significant, for the Supreme Court has recently reiterated that the Constitution does not require state courts to instruct juries on mitigating circumstances in the absence of supporting evidence. *Delo v. Lashley,* —— U.S. ——, ——, 113 S.Ct. 1222, 1224, 122 L.Ed.2d 620 (1993); *see also Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982). The Arkansas Supreme Court has reached a similar conclusion as a matter of state law. *Miller v. State,* 269 Ark. 341, 605 S.W.2d 430, 438 (1980) ("We think it a better practice, and less confusing to the jury, for the circuit judge to omit from submission any aggravating or mitigating circumstances that are completely unsupported by any evidence, and we take this opportunity to direct the circuit judges of Arkansas to hereafter follow this alternate procedure."), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1750, 68 L.Ed.2d 232 (1981). Consequently, there has been no showing that counsels' performance was deficient. Indeed, the blank form was mandated by the Arkansas Supreme Court in *Miller.*[12]

## VIII.

The jury unanimously found that the following two aggravating circumstances exist-ed at the time of Stumpp's murder: (1) Snell had knowingly created a great risk of death to someone other than the victim and (2) the murder was committed for pecuniary gain. At that time, the law of this circuit was that, in the context of robbery-murder, Arkansas' "pecuniary gain" aggravating circumstance violated the eighth amendment because it merely repeated an element of the underlying offense and therefore did not narrow the class of all murderers into a subset deserving the death penalty. *Collins v. Lockhart,* 754 F.2d 258, 264 (8th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). No *Collins* objection was raised at trial or on appeal, but Snell argued the point in his motion for post-conviction relief both as an eighth amendment claim and an ineffective assistance claim.

Since Snell's trial, the Supreme Court has held in *Lowenfield v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988), that

> the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, ..., so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

In *Perry v. Lockhart,* 871 F.2d 1384, 1393 (8th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989), this court held that *Lowenfield* required reversal of *Collins.*

Snell argued before the district court that because *Collins* was good law at the time of his trial, his counsel were ineffective for fail-

---

**12.** Snell claims the analysis is different as to the sixth mitigating factor—that "the defendant has no significant history of prior criminal activity"—listed in the Arkansas statute. He cites *Woodard v. Sargent,* 806 F.2d 153 (8th Cir.1986), where we held that it was ineffective assistance for defense counsel to fail to request such an instruction when there is no evidence in the record indicating a prior criminal history. However, even if *Woodard* remains good law after *Lashley,* it is not on point, for the panel in that case emphasized that the record contained absolutely no evidence of prior criminal activity and that "we can conceive of no possible tactical reason for such an omission." *Woodard,* 806 F.2d at 157. Such is not true here, for there was trial testimony that Snell participated in conspiracies to rob a different pawnshop and to bomb a pipeline. Trial counsel could well conclude that it would be better not to rehash those incidents, which the prosecution certainly would have emphasized had the instruction been given. Because Snell has not overcome the presumption that this was a valid trial strategy, he has not established deficient performance. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

ing to object to the pecuniary gain aggravating circumstance. The district court agreed, relying upon *Fretwell v. Lockhart*, 946 F.2d 571 (8th Cir.1991), a case exactly on point. The court therefore granted Snell's habeas petition, vacated his death sentence, and remanded to the Arkansas Supreme Court. *Snell v. Lockhart*, 791 F.Supp. at 1387–88.

Since the district court issued its ruling, the Supreme Court has overruled the Eighth Circuit's holding in *Fretwell*. *Lockhart v. Fretwell*, —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The Court concluded that, because *Perry* overruled *Collins*, Fretwell could not show that his death sentence was either an unfair or an unreliable result, and he therefore could not establish ineffective assistance based on a failure to raise a *Collins* objection. *Id.* —— U.S. at ——, 113 S.Ct. at 843. This holding directly controls our case, as Snell concedes. Consequently, we reverse the district court's grant of Snell's habeas petition.

Nevertheless, Snell asserts that this panel should revisit the underlying eighth amendment claim. He claims *Perry* is wrongly decided in that it interprets *Lowenfield* too broadly, and in his briefs he argued that the Supreme Court would probably limit *Lowenfield*'s application in the then pending case, *Tennessee v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 466 (1993). However, the Court has just recently dismissed the writ of certiorari originally granted in *Middlebrooks*. *See Tennessee v. Middlebrooks*, —— U.S. ——, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993).

 As Lockhart points out, the double counting issue Snell seeks to revive may have been procedurally defaulted, for Snell did not raise it on direct appeal, and the Arkansas Supreme Court refused to address it in Snell's Rule 37 proceedings. Nonetheless, passing quickly to the merits, we reject Snell's argument that *Perry* should be overturned. A panel of this court is not at liberty to overrule the established law of the circuit, *Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993); *Campbell v. Purkett*, 957 F.2d 535, 536 (8th Cir.1992); *Brown v. First Nat'l Bank in Lenox*, 844 F.2d 580, 582 (8th Cir.),

*cert. dismissed*, 487 U.S. 1260, 109 S.Ct. 20, 101 L.Ed.2d 971 (1988), and nothing in *Middlebrooks* leads us to believe that the Supreme Court has decided, or is going to decide, that *Perry* was bad law.

## IX.

Accordingly, we affirm the judgment of the district court to the extent it denied Snell's petition for writ of habeas corpus. To the extent the court granted the petition, we reverse and remand with directions to reinstate Snell's death sentence.